JOHNSON v. COWGILL et al.

(Circuit Court of Appeals, Ninth Circuit. January 5, 1920.)

No. 3344.

1. TRUSTS ☞262—BURDEN ON CESTUI TO PROVE THAT ATTORNEYS FOR ESTATE DIVIDED FEE WITH TRUSTEE.

In a suit by the cestui against the trustee and attorneys for the estate, who it was claimed divided their fee with the trustee, the cestui has the burden of proving an agreement between the attorneys and trustee to share the fee.

2. TRUSTS ☞231(1)—ATTORNEY AND TRUSTEE WHO DIVIDED FEE LIABLE TO CESTUI.

It is the duty of the trustee and attorneys for the estate to be perfectly true to the estate and cestui, and where the attorneys divided their fee with the trustee, etc., the cestui may recover the payment made to the trustee.

3. TRUSTS ☞262—EVIDENCE INSUFFICIENT TO SHOW ATTORNEYS DIVIDED FEE WITH TRUSTEE.

In a suit by the cestui against the trustee and attorneys for the estate, evidence held insufficient to show the attorneys divided their fee with the trustee.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; Frank H. Rudkin, Judge.

Suit by Frank Hansford Johnson against Lewis I. Cowgill and others. From a decree for defendants, complainant appeals. Affirmed.

John L. McNab and Byron Coleman, both of San Francisco, Cal., for appellant.

Goodfellow, Eells, Moore & Orrick and Mastick & Partridge, all of San Francisco, Cal., and Oscar Lawler, of Los Angeles, Cal., for appellees.

Before GILBERT, MORROW, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Johnson sued Cowgill and the firm of Denson, Cooley & Denson, attorneys, praying that the firm set forth the nature of their claim to a certain sum of money, and that any adverse claim they had should be declared of no validity, and for judgment against Cowgill for $10,312.50, with interest. The complaint is found-

ed upon the allegations: That in 1910 Johnson conveyed his estate, worth about $450,000, to his father and Cowgill, defendant herein, as trustee, to be managed by the trustee for 5 years; that in June, 1911, the father died, and Cowgill became and acted as sole trustee until about November 27, 1915, at which time he reconveyed certain property, and was relieved as trustee; that from 1911 until the close of the trust Denson, Cooley & Denson were attorneys for the trust and for Cowgill as trustee, and that about July 12, 1911, Johnson agreed with Denson, Cooley & Denson that they should act in the matter of the recovery of certain property claimed by Johnson; that in payment for the services rendered by the attorneys Johnson made two certain promissory notes for $10,000 each, payable 6 and 12 months, respectively, after date; that the notes by their terms were to be paid by the trustee out of the trust estate, and were approved and accepted by the trustee in writing as a charge against the trust estate; that when the attorney's fee of $20,000 was fixed, it was secretly agreed between the law firm and Cowgill that the law firm and Cowgill would divide the fee, and that when the two notes, of $10,000 each, should be delivered, one should be the property of Cowgill, and the other of Denson, Cooley & Denson; that Cowgill, as trustee, about November 1, 1911, took the notes to the law firm, and that the elder Denson indorsed one of them on behalf of the firm and handed it to Cowgill as his share of the $20,000; that Cowgill retained the note as his private property, and that from May 31, 1912, to November 6, 1912, Cowgill, as trustee, fraudulently took from the estate certain sums for interest on the $10,000 note retained by him; that about November 6, 1912, Cowgill paid the law firm $10,000 from the estate funds, and fraudulently took $10,000 from the estate funds for his own use in payment of the other note, and falsely represented to plaintiff that he had paid these sums as trustee to the law firm in settlement of the note; that Cowgill fraudulently, as trustee, told plaintiff that he paid the $10,000 and certain interest to the law firm on account of the note retained by him, whereas such amount was never paid by Cowgill to the law firm on behalf of the trust estate; that Cowgill never has accounted, and did conceal from plaintiff the fact that the amount was appropriated to his own private use; that the law firm, although retained to act for Cowgill as trustee, never told plaintiff of the transactions; and that plaintiff never knew of the matter referred to until August 18, 1916, when he demanded the return of the $10,312.50 from Cowgill.

Denson, Cooley & Denson admit professional employment and plead that the notes of $10,000 each were given in payment of professional services and are the property of the firm, and aver that the only reason that payment in full of both notes was not made at maturity was because of the then financial condition of the trust estate. They deny all secret agreements and fraud and division of the notes with Cowgill, and ask judgment against Johnson and Cowgill for $10,000 and interest. Cowgill also denies fraud or any agreement with the law firm, whereby he was to receive any benefit in a personal way, and asks judgment in favor of Denson, Cooley & Denson against plaintiff and against himself.

The District Court found that there was no agreement between Cowgill and the law firm, or any member of it, for any division of the $20,000 mentioned in the complaint, or any agreement that Cowgill should become the owner of either one of the notes given in payment of the fee, or the proceeds thereof, and that the entire fee and both of the notes and the proceeds thereof were always the property of the defendants Denson, Cooley & Denson. The complaint was ordered dismissed, without costs to either party.

The first important question is whether or not there was any arrangement or understanding of any kind between the law firm, or any member of it, and Cowgill, whereby Cowgill was to receive any part of the $20,000 which Johnson agreed to pay the attorneys for professional services rendered under the agreement between Johnson and Denson, Cooley & Denson. If there was any such arrangement, it must have been made between Judge Denson and Cowgill, for clearly they were the only persons who had to do with the making of it. It is essential, therefore, that the evidence be considered.

Johnson testified that in July, 1911, he employed the law firm upon the recommendation of Cowgill, and that after settlement of the legal matter was made in August, 1911, neither he nor the trust had the money to pay the lawyers; that Cowgill said that he would arrange so that two notes would be given, and that the two notes were then given by Johnson and were delivered to Cowgill. It appears that one of the notes was paid November 6, 1912, and that two payments were made on the other note in November, 1912. Three checks were offered in evidence—one dated November 6, 1912, for $5,000 to L. I. Cowgill, signed by F. H. Johnson Trust, L. I. Cowgill, Trustee; one dated November 6, 1912, in favor of L. I. Cowgill, for $17,517.50, signed by F. H. Johnson Trust, by L. I. Cowgill, Trustee; another dated November 8, 1912, in favor of L. I. Cowgill, for $10,018.31, signed by L. I. Cowgill, Trustee. Johnson also said that the trust was closed on November 27, 1915, and that it was not until six months afterward that he learned that Cowgill had received a part of the $20,000 fee; that when the trust was closed Cowgill turned over certain property to him.

Mr. Berry, who had been attorney for plaintiff, Johnson, preceding the summer of 1916, testified that in July, 1916, he called upon Judge Denson in relation to the fee of $20,000; that Judge Denson told him that the $20,000 fee received in settlement of Johnson's claim against his father's estate was not all received by Denson, Cooley & Denson; that Cowgill "demanded or asked" a division with him, and that Denson said that Cowgill was an old client, and "I was not in a position to refuse, and we did divide it with him." Witness said he never told Johnson what Denson said, as at the time he was not friendly with Johnson.

Mr. G. H. Smith, counsel for Frank Johnson, testified in substance that he first met Judge Denson on August 18, 1916, at Denson's office, whither he went as attorney for Johnson "to demand from Cowgill half of that $20,000 fee that Denson, Cooley & Denson had divided with him and half of any other fees that the law firm might have di-

vided with him." Mr. Smith says that he opened the conversation with that demand, and after a pause Judge Denson said that that was "the only one"; that Judge Denson talked for some minutes, and said that Cowgill had brought business to the firm, and that they had not charged Cowgill anything. Witness said that Denson said he thought the matter of the fee might come up, and that he had kept himself clear; that the firm had recovered the property for Johnson, and was entitled to the fee. Mr. Smith said:

"I asked him if Mr. Cowgill had had anything to do with the fixing of the fee, and he said he had. I asked him if he had agreed to divide the fee with Mr. Cowgill at the time it was fixed, and he said 'No.' He said he agreed to divide the fee before the notes were given, but not at the time the contract was made."

Mr. Smith also said that Denson told him he drew the notes, and that Mr. Cowgill brought them back to him all signed; that Cowgill came into his (Denson's) office and laid the notes down on his desk, and that he took one, and indorsed it, and handed it to Cowgill, and had never seen the notes again, and never spoke of it again. Mr. Smith also testified that Judge Denson said that the fee had been earned, and he thought Cowgill was entitled to compensation, and that he had given him one of the notes; that there was then some conversation with respect to the ethical and legal point of view, and that Denson, in answer to a question, replied that he had a right as attorney for the trust to divide his fee with the trustee as he had, but also said that he had kept himself "in the clear out of this all the time." Witness said that Denson agreed to communicate with Cowgill; that Denson made no claim to the money or the note which he indorsed and delivered to Cowgill; that he told Denson that, if Cowgill did not pay the money immediately, suit would be instituted. Mr. Smith further said that Denson told him that he had seen Cowgill, and that if there was any money belonging to Johnson he wanted to pay it; that he did not think he had any money of Johnson's, and that Cowgill had suggested an arbitration, whereby some disinterested counsel should consider the facts, and that, if he found that "this money" belonged to Johnson, Cowgill would pay it, and if the money was found to belong to Cowgill, Cowgill would retain it; that witness declined any suggestion of arbitration, and told Denson that suit would be brought unless the money was forthcoming by the 28th of August, and that as the money was not paid at that time this present suit was brought about August 30, 1916; that in February, 1917, Cowgill, with his counsel, Mr. Lawler, called upon the witness, and stated that Cowgill had obtained the privilege of using the money from Denson until he "got all of his money out of the estate, and that he had now gotten all his money out of the estate, and they were willing to pay the money to whom it belonged."

S. C. Denson, referred to as Judge Denson, who died after the present suit was filed, and who was senior member of the firm of Denson, Cooley & Denson, in his deposition testified that Johnson consulted him about the right to recover certain property which, under an understanding had with his father, Johnson claimed should come back to

him, and that in July, 1911, the arrangement already referred to concerning fees was made; that afterwards a compromise was had whereby certain property was taken back, subject to certain liens which Cowgill, the trustee of Frank H. Johnson, was to take care of; that Johnson went to the office of the law firm, but, not having the $20,000 to pay the firm, said he would give notes, and the two notes were drawn up and delivered by Johnson to him for the firm; that the notes were in settlement of the services performed by the firm, and were the property of the firm; that there never was at any time any arrangement with Cowgill for a division of the fee; that the subject never was discussed, and that neither of the notes had ever been given to Cowgill as a share of the fee. Mr. Denson said that he gave the two notes to Cowgill as president of the Merchants' National Bank with which bank the firm had an account; that they desired to borrow $6,000, and would give a note for that sum to the bank; that they borrowed $6,000 upon the firm note; that later on the firm was notified that one of the notes had been paid, and that after the firm note of $6,000 was paid to the bank they still had a credit of $4,035; that he did not know what became of the other $10,000 note, but that he handed it to Cowgill as president of the bank, and never saw it afterwards, and supposed there would be a settlement some time; that he knew Cowgill did not have the money with which to settle the Johnson trust, and that he was willing that Cowgill should use the $10,000 note "to help carry him through"; that there was no arrangement with Cowgill, whereby Cowgill was to collect either of the notes and retain the proceeds for his own use, and no agreement as to any division of the notes or fee at any time or place, or under any circumstances, and that there was no division. On cross-examination Mr. Denson said that his firm was retained in October, 1911, and remained attorneys for the Johnson trust until November, 1915, that he had been attorney for Cowgill and Cowgill's bank for many years; that he expected to be paid out of the Johnson estate; that he had never spoken to the bank about the $10,000 note, although he had spoken to Cowgill about it, and Cowgill never had paid interest on the note from November, 1911, and that when Cowgill and Johnson had their settlement, in 1916, Johnson was obliged to give Cowgill a note and mortgage on certain property to secure the balance he owed; that he remembered the visit of Mr. Berry to his office, and, although he might have told Mr. Berry that he had not received the balance of the money, he never told him or anybody else that there had been any division, or any request by Cowgill for half the fee, or any demand made by Cowgill for one of the $10,000 notes. He also said that in response to questions he may have told Mr. Smith, at the interview had in August, 1916, that he understood a question would arise concerning the fee, but that he said he had nothing to fear about it; that he had not told Mr. Smith that it had been understood between him and Cowgill that there was to be a division of the notes; that there was a good deal of talk between him and Mr. Smith, and that he told Mr. Smith that he had seen Cowgill, and that Smith said suit would be brought, and that Cowgill suggested a submission to arbitration, so that, if Johnson was entitled to any-

thing, he was ready to give it to him, and that the matter might be adjusted without litigation. Witness also said that he let the $10,000 matter drift, and carried the matter along as an asset coming to the firm; that he knew Cowgill was embarrassed in having to carry the Johnson trust, and had not received the money due him; that when he spoke of arbitration he believed that his firm would get the money, as he knew they were entitled to it, and that arbitration was a suggestion made by Cowgill to him to avoid litigation. Witness said he was 77 years old.

Cowgill said that he advised Johnson to employ Denson, whom he had known for many years and whom he believed capable and reliable; that he introduced Johnson to Denson, and at Johnson's request was present when they talked about what fee should be paid to Judge Denson; that when the properties were finally recovered he knew notes had been given to Judge Denson, because they were brought to him to be "accepted" by him as trustee; that neither of the notes came into his possession until the law firm made application for the $6,000 loan, about February, 1912; that when this sum was borrowed, one of the notes was handed to him as security for the $6,000, and the other still remained in the possession of the law firm; that afterwards, when the bank of which Cowgill was president consolidated with another bank in June, 1912, objection was made to taking over the attorneys' note secured by the Johnson trust, because the Johnson trust also owed the bank, whereupon Cowgill said that he would see that the note was taken up, and accordingly about May 22d he took up the note, paying the firm $10,000 on the first note out of his own funds; that when this was done he told Judge Denson of the objections to the firm's obligation, and that he would take up the $6,000 note, if Denson would allow him to take the other $10,000 note, "so that it could not come up against the trust, and we could not be forced to pay it at any time"; that he wanted to hold such other note until he got his own money out of the trust, as it was hardly fair that they should get all their money out of the trust, when he personally had to carry the trust and could not get his own money.

Cowgill denied positively that there was any agreement or understanding with the firm for a division of the $20,000, or that he had ever made any claim to any part of such sum. He said: That on November 8th he received $20,000 and interest, which was credited on the books to the notes. That the trust then owed him a large sum. That he put the papers in connection with certain estate transactions in an envelope and wrote upon it as follows: "Agreement Frank H. Johnson; due Denson $10,000; interest 6% from 5/1/12." That this writing was made about May 1, 1912, and prior to June 1st. On cross-examination Cowgill said that he never saw the notes until he was called upon to approve and accept them; that the first note was given to him as president of the bank about February 1, 1912, and that he got the second note the latter part of May, 1912, when he took up the two notes, paid the cash on the first, and took the second with the understanding of carrying the one if he would give him the other to be held until he got his money out of the estate; that he first

learned of the demand of Johnson for the payment of $10,000 after Mr. Smith had interviewed Judge Denson.

A. E. Cooley, of the firm of Denson, Cooley & Denson, said: That under date of July 7, 1911, he entered in the ledger as follows: "To retainer and services in settlement of general business in connection with the estate of Frank S. Johnson, $20,000." That thereafter, under date of November 1, 1911, entered as follows: "Promissory note for services in settling claim against estate of Johnson et al., to be received as payment when notes actually paid, $20,000." And again, on May 22, 1912, as follows: "L. I. Cowgill, $10,035." Witness said that the notes were given to him by Judge Denson about November, 1911, and that they remained in the firm safe until February 1, 1912; that he then took the first note for $10,000 to the bank, with their own note, and borrowed $6,000 already referred to; that Judge Denson was mistaken when he said he had indorsed both notes, as the second note never was indorsed by Judge Denson; that on February 1, 1912, the cashbook of the firm shows the loan from the bank and a division of the $6,000 among the members of the firm; that the other note remained in the safe until Judge Denson had to do with it in May; that he never consented to any division of the fee, and urged Judge Denson to collect it; that no statement ever was made by Judge Denson of any agreement to give part of the fee to Cowgill; that Judge Denson said that Cowgill was a friend of the firm, and that it was hard to urge him to pay the money immediately.

H. B. Denson, also a member of the firm, said that the one note was turned over to the bank when the $6,000 loan was made to the firm, and that the other note remained in the safe until the elder Denson delivered it to Cowgill; that he never knew of any arrangement for division, and that his father never told him there was any such arrangement; that he frequently spoke to his father about collecting the note, but that his father said that he could not press Cowgill, but that they would get it as soon as affairs were straightened up.

The evidence showed entries in the cashbook of the Johnson trust, the entries having been made by the bookkeeper under the direction of Cowgill. Among the items are these:

"November 2, L. I. Cowgill, bills payable, on account of note of Denson, Cooley & Denson, $10,000;" same date, "To L. I. Cowgill, bills payable, interest note Denson, Cooley & Denson, $10; November 6, bills payable, L. I. Cowgill, second note of Denson, Cooley & Denson, $5,000; November 8, L. I. Cowgill, bills payable, balance account of note Denson, Cooley & Denson, $5,000; interest paid in full, $6.67."

[1-3] It is clear that the firm of Denson, Cooley & Denson made their contract for professional services with Johnson as an individual, and at a time before the firm became attorneys for the Johnson trust. It is also evident that in May, 1912, Cowgill paid the first note out of his own private funds and there is strong evidence to support the view that, as a part consideration for the payment so made by Cowgill, Judge Denson agreed that Cowgill could hold and use the other $10,000 note until such time as he would be paid sums which he had advanced to the Johnson trust. From a strict evidential standpoint it

was therefore incumbent upon Johnson to prove that there was an agreement between Denson and Cowgill to share the $20,000 fee to be paid for services to be performed under the agreement with Johnson. But we have examined the case without adhering to close discrimination as to who holds the burden of proof, for upon principle in the dealings between Denson and Cowgill and Johnson the lawyers and Cowgill were under the strictest obligation to be perfectly true to Johnson and to the trust, and we readily concede that, if it were established that Denson gave the $10,000 note to Cowgill, the plaintiff should have a decree. But there is no substantial direct evidence upon which to base a finding that Cowgill ever made any profit from the trust estate on the notes involved in this litigation.

There is testimony that Judge Denson admitted to Mr. Smith and Mr. Berry that he had divided the fee with Cowgill. Judge Denson, however, positively denied ever having made any admissions of such character, and he gave an explanation of his connection with the notes which, if credible, is not inconsistent with rectitude and integrity. If there had been a gift of the note to Cowgill, or if there had been any arrangement whereby Cowgill was to receive any part of the fee, would it not have been natural that he should have told his partners, and not concealed the matter from them? What motive could have existed for such a violation, not only of obligation to general morality, but of fair dealing to his partners, one of whom was his son? None is proven. Mr. Smith, evidently feeling a deep sense of outrage at the report that Cowgill and Denson had made such arrangement, and acting under the belief that it was true, arraigned Judge Denson, and says that Denson admitted that he had divided with Cowgill; yet Mr. Smith says that Judge Denson more than once stated that he had kept himself "in the clear" or "out of the grease."

Inasmuch as even a slight mistake or error of recollection by Mr. Smith might alter the effect of the statements, we look to circumstances to aid us in reaching the proper result; and as indicating fallibility in the recollection of Mr. Smith we find that Mr. Smith said that Denson told him that he drew the notes and that Cowgill brought them back to him all signed, and that he (Denson) took one and indorsed it and handed it to Cowgill, and had not seen the notes thereafter; whereas Cooley testified that the notes were both handed to him by Judge Denson about November, 1911, and were both put in the safe, and remained there in the office of the law firm until February 1, 1912, when the $6,-000 loan matter came up, and he himself indorsed one of the notes, and personally delivered it to the bank, and received a credit to the account of the firm of $6,000. As corroborative of this statement of Cooley, there is evidence that there is an indorsement of Denson, Cooley & Denson by Cooley in his handwriting, and a waiver of protest and demand and notice on the notes. This evidence also shows that Judge Denson erred when he said he had indorsed both the notes. But, furthermore, the cash book of the firm of Denson, Cooley & Denson shows that on February 1, 1912, the firm received $6,000 loan from the bank and that the $6,000 was divided among the members of the firm. More than this, Mr. Denson, the younger, says that he knew that the notes

were left in the office of the firm and put in the safe in Mr. Cooley's room, and that they remained there for several months, or until about February, when the $6,000 note was made, and that afterwards the $10,000 note was delivered by the elder Denson to Cowgill.

We therefore have, upon the vital question, the positive denial of Judge Denson that he ever made the statements attributed to him by Mr. Smith and Mr. Berry, and his affirmative statement that there never was any agreement or understanding that Cowgill was to have any part of the fee; also the positive statement by Cowgill that no arrangement of any kind for division of the fee was made by him with Judge Denson, and that it was understood that he was only to hold the second note until he could collect the money due him from the Johnson trust estate. Upon this point, and confirming the testimony of Cowgill there is the envelope in which Cowgill had put certain papers for final settlement of the Johnson trust, upon which Cowgill had indorsed what is in effect acknowledgment of an indebtedness to Denson, Cooley & Denson upon the second $10,000 note. Cowgill, when the trust was wound up, charged Johnson with the second note and with interest thereon to maturity. It is also shown that payment of this second note was made to Cowgill; he having charged the trust with the payment of both notes, and having assumed the obligation to the law firm, deferring payment of the second note until he could get his money from the trust, payment of which sum was not made until subsequent to the institution of this suit.

There is the further evidence of Cooley and Denson that no information was ever given to them by Judge Denson that there had been any agreement of division with Cowgill. When we weigh this evidence, it leads to a judgment, in accord with that of the District Court, that there never was any agreement made with relation to a division of the fee between Cowgill and Denson. A contrary conclusion could be founded only upon the view that the elder Denson had willfully committed perjury in his deposition, that Cowgill had also deliberately perjured himself, and that the two had combined in a wicked purpose to deceive Johnson and to enrich Cowgill, the trustee of the Johnson trust. It would also have to be founded upon the premise that Denson, a lawyer of presumably good character, had wrongfully concealed from his associates all knowledge of a matter in which they were deeply interested, morally as well as financially, and concerning which he should have fully informed them.

In conclusion, after a very attentive examination of all of the testimony, our opinion is that the findings of the District Court must be sustained, and that the dismissal of the complaint, without costs to either party, was right.

Affirmed.